**Filed: March 29, 2012**

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Plaintiff - Respondent,

v.

ROBERT PAUL LANGLEY, JR.,

Defendant - Appellant.

(CC 88C21624; SC S053206)

On automatic and direct review of the judgment of conviction and sentence of death imposed by the Marion County Circuit Court.

Joseph V. Ochoa, Judge.

Argued and submitted April 27, 2011.

Frank E. Stoller, Dundee, argued the cause and filed the briefs for defendant-appellant.

Carolyn Alexander, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiff-respondent. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before De Muniz, Chief Justice, Durham and Walters, Justices, Haselton, Judge, and Gillette, Senior Judge.*

DURHAM, J.

The judgment of the circuit court is reversed and the case is remanded to the circuit court for further proceedings.

*Balmer, Kistler, Linder, and Landau, JJ., did not participate in the consideration or decision of this case.

DURHAM, J.

This case is before this court for the third time on automatic and direct review of a judgment that imposed a sentence of death for aggravated murder.[1] This court has previously affirmed defendant's aggravated murder convictions, but twice has vacated his sentence of death and remanded for further penalty-phase proceedings, as we discuss in greater detail below. On this third review, defendant raises 27 assignments of error related to the third and most recent penalty-phase proceeding. As his second assignment of error, defendant submits that the trial court erred by requiring him to proceed *pro se* without first securing a valid waiver of his right to counsel. Because we determine that that assignment of error is well taken, we reverse the trial court judgment and remand the case to the trial court for further penalty-phase proceedings.

In December 1989, a jury found defendant guilty of 16 counts of aggravated murder relating to the death of Anne Gray. A few months later, defendant was sentenced to death.[2] In 1992, this court affirmed 15 of defendant's aggravated murder convictions. *State v. Langley*, 314 Or 247, 839 P2d 692 (1992), *adh'd to on*

---

[1] *See* ORS 138.012(1) (providing that a "judgment of conviction and sentence of death * * * is subject to automatic and direct review by the Supreme Court").

[2] The facts underlying defendant's convictions for the murder of Anne Gray are set forth in *State v. Langley*, 314 Or 247, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) (*Langley I*).

Defendant also was convicted of aggravated murder and sentenced to death for the April 1988 death of Larry Rockenbrant. On automatic and direct review of that judgment of conviction and sentence of death, this court reversed defendant's murder convictions and remanded for a new trial. *State v. Langley*, 314 Or 511, 520, 840 P2d 691 (1992). On remand in that case, defendant was again convicted of aggravated murder and he received a sentence of life imprisonment with a minimum imprisonment of 30 years without the possibility of parole.

*recons*, 318 Or 28, 861 P2d 1012 (1993) (*Langley I*). The court in *Langley I*, however, vacated defendant's death sentence on the ground that the trial court had failed to give a proper jury instruction on the consideration and use of mitigating evidence, as required by *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den*, 498 US 879 (1990) (*Wagner II*). *Langley I*, 314 Or at 269-72.

After a second penalty-phase proceeding, defendant again received a death sentence for Gray's murder. In 2000, on automatic and direct review, this court vacated that death sentence, concluding that the trial court had erred by refusing to allow defendant to waive his *ex post facto* objection to retroactive application of the true-life sentencing option, and thus also erred by refusing to instruct the jury on that sentencing option. *State v. Langley*, 331 Or 430, 440, 16 P3d 489 (2000) (*Langley II*). The court in *Langley II* remanded the case to the trial court for a third penalty-phase proceeding. That third penalty-phase proceeding is now before us on automatic and direct review.

When the case returned to the trial court in early 2001 for a third penalty-phase proceeding, the trial court appointed Karen Steele and Marc Friedman to represent defendant. In November 2002, three months before the scheduled January 2003 trial date, Friedman moved to withdraw, and Judge Guimond granted that motion. Concerned about her lack of co-counsel, Steele moved on defendant's behalf to set the trial date over until January 2004. Judge Guimond granted that motion in part, setting the trial date for October 2003. Judge Guimond noted that he did not believe that competent counsel would require an additional year to prepare. Shortly thereafter, Rose Jade was appointed as co-counsel for defendant.

In August 2003, defendant, through Steele and Jade, moved for another continuance. Steele submitted a supporting affidavit in which she averred that the defense could not provide adequate assistance of counsel if the trial date was not continued. On September 4, 2003, over defendant's objection, Judge Guimond issued an order removing Jade and Steele as defendant's counsel, explaining that he had no reason to believe that defendant or defense counsel would be ready for trial and that, accordingly, the interests of justice required the removal of Steele and Jade.

Judge Guimond thereafter appointed Kenneth Hadley to represent defendant and continued the trial date. Defendant voiced dissatisfaction with the court's removal of Steele and Jade, and refused to cooperate with Hadley. In response, Judge Guimond held a hearing in November 2003. At that hearing, Judge Guimond encouraged defendant to cooperate with Hadley, and told defendant that under no circumstances would he reappoint Jade or Steele as defendant's counsel. Judge Guimond explained to defendant that he wanted defendant to have competent counsel, but cautioned that "somewhere in these proceedings, [defendant], I will appoint counsel who will move forward on this case regardless of your cooperation or lack of cooperation."

Subsequently, defendant indicated further that he would not cooperate with Hadley and, as a result, Hadley filed a motion to withdraw. Believing that defendant's refusal to cooperate stemmed from frustration towards the court for the court's previous removal of Jade and Steele, Judge Guimond denied Hadley's motion and recused himself from the case in December 2003. In his letter to the parties explaining his decision, Judge Guimond stated that he believed that a different trial court judge would be able to

4

bring the case "to a fair and reasoned conclusion within a reasonable time frame" with greater ease.

After Judge Guimond recused himself, Judge Leggert was assigned to the case. Defendant, however, still did not cooperate with Hadley. Hadley filed a renewed motion to withdraw. At a March 17, 2004, hearing, Judge Leggert considered Hadley's renewed motion to withdraw and initially denied it. Judge Leggert warned defendant that he should cooperate with Hadley because his refusal to cooperate could affect the quality of Hadley's representation but would not be a ground for Hadley's removal. Judge Leggert did not find that defendant was engaging in misconduct in declining to cooperate with Hadley. Subsequently, however, Judge Leggert granted Hadley's motion to withdraw, and appointed Ralph Smith as defendant's counsel. Judge Leggert later recused herself from the case.

In June 2004, the case was assigned to Judge Ochoa. Judge Ochoa appointed Duane McCabe as co-counsel in August 2004, and set a trial date of October 17, 2005. An order setting the trial date stated that "[a] change of counsel by defendant shall not be cause to continue or change this trial date." In April 2005, Judge Ochoa appointed Kathleen Bergland as third-chair counsel.

On June 27, 2005, less than four months before the October 2005 trial date, Smith and McCabe filed joint and individual motions to withdraw; they filed affidavits supporting those motions *ex parte* and under seal.[3] On July 13, 2005, Judge Ochoa held a

_____

[3] Previously, defendant had attempted personally to submit *pro se* filings to the court, including a motion for substitution of counsel. Acting pursuant to an earlier

5

hearing on those motions. At the hearing, Smith and McCabe were represented by counsel and defendant was represented by independent counsel Craig Rockwell.[4] The trial court first allowed defendant and Rockwell to review Smith's and McCabe's motions and supporting affidavits.

During the discussion on the motions, the trial court characterized the motions and supporting materials as averring the existence of "irreconcilable differences * * * not of [defendant's] making." When the trial court sought additional details, Smith, through counsel, responded that he could not answer that question without disclosing attorney work product or confidential communications protected by the attorney-client privilege. At that point, the state's lawyers offered to leave the courtroom if that was necessary for the court to question Smith and McCabe and to make necessary findings in support of any ruling on Smith's and McCabe's motions. The court did not act on that offer.

The trial court then asked defendant personally to state his reasons for supporting Smith's and McCabe's motions to withdraw. Defendant, through Rockwell, responded that defendant believed that the motions should be granted, but also indicated that defendant did not want to proceed *pro se*. Through counsel, defendant stated that, generally speaking, he believed "that the attorney-client relationship has broken down to

---

order, the trial court declined to accept those *pro se* filings.

[4] The court appointed Rockwell to represent defendant for the limited purpose of ruling on Smith's and McCabe's motions to withdraw.

Bergland did not move to withdraw. At the time of the hearing, she had met defendant only once (in her role as third-chair counsel).

such a degree that he is not able to proceed to trial with these counsel." When the trial court requested more detail, defendant, through counsel, declined to further explain the answer in open court, but indicated that he wanted to give the explanation in an *ex parte* response filed under seal. The trial court denied that request. Counsel for defendant also asked the court to consider allowing defendant to explain his problems regarding his trial counsel out of the presence of the state's lawyers and the public. The court responded by confirming that defendant was declining to give his explanation in open court, and stated, "Well, you don't leave me much information to go on, Mr. Langley."

The court then granted McCabe's motion to withdraw but denied Smith's motion to withdraw. The court explained its reasoning:

> "[T]he Court looks at a number of issues in this case. The Court looks at the affidavits under seal from Marc Friedman and Mr. Smith and Mr. McCabe. The Court looks at the affidavit that is not under seal from Mr. Hadley, where [Mr. Hadley stated that] Mr. Langley refused to cooperate with him and discuss with him.
>
> "The Court finds a pattern of manipulation on Mr. Langley's part to seek continuances. And indirectly when denied continuances from the Court, his pattern of manipulation the Court thinks is a finding of fact, is that he will seek to be uncooperative with his attorney and delay the process by trying to force the Court into a corner to appoint a new attorney."

The court explained that it was granting McCabe's motion to withdraw and denying Smith's motion to withdraw because "the affidavits are distinct from one another" and "there's a different quality in terms of the conflict that's been created."[5] In a subsequent order memorializing that decision, the court explained that, at the time that it denied

---

[5] We have reviewed the affidavits, and they support the trial court's factual finding on this point.

7

Smith's motion to withdraw, the court believed that defendant and Smith could "rehabilitate the attorney-client relationship if defendant were to cooperate."

Immediately after granting McCabe's motion to withdraw and denying Smith's motion, the trial court stated that "[defendant] has a choice. If he does not want Mr. Smith and Ms. Bergland to continue in his representation, he will represent himself in this matter." The court also indicated that it would entertain a request to have defendant proceed *pro se* with the assistance of Smith as advisory counsel, but that in no circumstance would the court appoint different substitute counsel or continue the October 17, 2005, trial date. The court then stated that it would take a recess to enable defendant to discuss those options with Rockwell.

Before the recess, counsel for Smith and McCabe expressed concerns about the effect of the trial court's decision on defendant's ability to receive adequate counsel:

> "[T]he defense team has allocated specific responsibilities to specific members of that team. The Court's order guts that and renders it unreasonable to expect the remaining members of that team to be able to render effective assistance of counsel. And I think that -- I would urge the Court to reconsider the idea of removing more than a third, if less than a half, of the defense team at this juncture.
>
> "* * * [T]he allocation of responsibilities between Mr. McCabe and Mr. Smith have been clear and in effect for many, many months now. And to remove Mr. McCabe simply does not allow the defense to properly prepare within the limited time that remains."

The trial court replied that it understood that concern, but observed that, to the extent that the defense team "may now be placed at a disadvantage," that circumstance was the result of defendant's own conduct.

The court then took the recess. Upon returning from the recess, the trial

8

court indicated that it had reconsidered its earlier ruling denying defendant's request to submit an *ex parte* sealed affidavit in response to the motions to withdraw. The court explained that defendant "may submit an affidavit under seal with the understanding that I'm not going to review it," and defendant subsequently did so.[6]

Next, the court inquired how defendant wished to proceed regarding counsel. Through Rockwell, defendant stated that, on Rockwell's advice, it was his "decision not to accept any of those choices and to have the Court go ahead and direct how he is to proceed." The court characterized defendant's response as "further evidence that [defendant] seeks to manipulate the system" by "refus[ing] to cooperate with his attorneys" and "refus[ing] to participate." The court then ruled that defendant would proceed *pro se*.

Defendant, through Rockwell, objected:

"It's [defendant's] opinion that the Court's ruling is in error.

"* * * * *

"* * * [T]he Court's ruling was in error and that [defendant] should not be in the position of having to make this choice, none of [the court's offered options] are attractive to him when he is entitled to constitutionally adequate counsel."

The trial court noted defendant's objection for purposes of appeal, but adhered to its original decision to treat defendant's refusal to choose among the offered options as a decision to proceed *pro se*. After advising defendant of the risks of proceeding *pro se*, the court discharged Smith, and assigned Bergland to act as defendant's advisory counsel.

---

[6] In conformance with its ruling, the trial court did not read the affidavit.

9

The trial court memorialized its oral rulings in a subsequent written order captioned as an "order allowing joint and individual motion to withdraw and terminate representation." The order first explained the analytical framework that it had applied reaching that decision:

> "[T]he court must balance defendant's right to adequate counsel with the orderly proceedings of court (court docket, delays, etc.). The court must also 1) consider the timeliness of the motion as well as the timeliness of the court's hearing, 2) ensure the adequacy of the court's inquiry, 3) consider whether the conflict is so great that it resulted in a total lack of communication preventing an adequate defense, and 4) consider the nature and the source of the conflict. The court is cognizant that this is a capital case and must do everything to ensure that defendant is afforded all due process both mandated and possible within reason under the circumstances of the case."

As to the issue regarding the adequacy of the court's inquiry, the trial court indicated that it had denied defendant's request to explain why he wanted new counsel under seal because defendant, unlike Smith and McCabe, was not a lawyer subject to the disciplinary rules of the Oregon State Bar. As to the issue regarding the nature and source of the conflict, the trial court considered the affidavits supporting the motions to withdraw of Smith, McCabe, Hadley, and Friedman:

> "All [four] affidavits reveal a pattern [of] non-cooperation and hostility on the part of the defendant. If this behavior was only reflected in the affidavits of * * * Smith and McCabe, then there would be some merit in the argument that the conflict was not of the defendant's making. That is not the case however. It is also reflected in Mr. Friedman's affidavit in 2002, and Mr. Hadley's affidavit in 2004."

Based on the affidavits, the court determined that a genuine conflict of interest existed, and that it was caused by defendant's "ongoing actions to manipulate court proceedings and delay trial in this case."

10

The court made the following factual findings about defendant's case:

"1. This case was remanded by the Oregon Supreme Court in December of 2000 for resentencing;

"2. The defendant has had five trial dates, [and] seven defense attorneys * * * since the case was remanded in December of 2000;

"3. The defendant has demonstrated an undeniable pattern of manipulation. The defendant has cooperated with defense attorneys only as long as they were willing and able to obtain continuances of trial dates. When unable to obtain a continuance on his behalf, the defendant refused to cooperate, and has created a conflict of interest;

"4. The conflicts between the defendant and his attorneys were created by the defendant in an effort to manipulate the criminal justice system and delay his resentencing[.]"

After the beginning of *voir dire* but before the beginning of trial, the court relieved Bergland from her role as advisory counsel at defendant's request. Defendant proceeded *pro se* at trial. He declined to participate in *voir dire*, present his own case, cross-examine the state's witnesses, or make opening and closing arguments. After considering the evidence presented by the state, the jury answered each of the four questions on the verdict form "yes," and the trial court entered a judgment sentencing defendant to death.

On automatic and direct review in this court, defendant's second assignment of error argues that the trial court erred by requiring him to proceed without representation by counsel, *i.e.*, by removing his court-appointed counsel and failing to provide substitute counsel. We understand the assignment of error to encompass two related but distinct arguments. First, defendant argues that, in light of the facts that he concurred in the motions of Smith and McCabe to withdraw as his counsel and that the

11

trial court failed to consider the *ex parte* evidence of his dissatisfaction with Smith, the court's purported "offer" of a "choice" to affirmatively accept representation by Smith and Bergland or to represent himself *pro se* was illusory. Second, defendant argues that, by requiring him to proceed *pro se* in the absence of a knowing and intentional waiver of his right to counsel, the trial court violated his state and federal constitutional rights to counsel.

The state responds that the trial court acted within its discretion by declining to appoint new counsel or to consider defendant's reasons for dissatisfaction with counsel if defendant was willing to state his concerns only in an *ex parte* response submitted under seal. The state also submits that, even if the trial court had reviewed defendant's response, defendant's claim that he had legitimate complaints with Smith and McCabe's representation would have failed because his response reveals only a disagreement about trial strategy. Additionally, the state argues that, because defendant's refusal to make a choice, as proposed by the trial court, was based on defendant's desire to manipulate the system and create error, his "choice to proceed *pro se* was his own, as a practical matter, and nothing in this record suggests that it was not voluntary." The state further argues that, because defendant's delay tactics placed the trial court in the position where no practical alternative to self-representation existed, it is immaterial that defendant "did not explicitly ask to represent himself."

We begin with a description of the applicable legal principles governing a criminal defendant's right to counsel. A defendant in a criminal case has a constitutional right to adequate assistance of counsel under both Article I, section 11, of the Oregon

12

Constitution[7] and the Sixth Amendment to the United States Constitution.[8] That right encompasses the right to "an adequate performance by counsel of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf." *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981); *see also Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (similar standard under the Sixth Amendment).

Oregon's legislature has created the Public Defense Services Commission (PDSC), ORS 151.213, and requires it to:

> "(a) Establish and maintain a public defense system that ensures the provision of public defense services in the most cost-efficient manner consistent with the Oregon Constitution, the United States Constitution and Oregon and national standards of justice."

ORS 151.216(1)(a). According to the PDSC policy entitled "Legal Representation Plan for Death Penalty Cases" (Plan), adopted June 14, 2007, the Office of Public Defense Services, which is established by the PDSC, ORS 151.211(5), "shall authorize appointment of co-counsel whenever it is reasonable and necessary considering both the circumstances of the case and lead counsel's circumstances and needs." Plan, ¶ 2. The Plan also provides:

> "Unless the particular circumstances of the case or the defendant make such a team or a particular member of the team unnecessary for high

---

[7] Article I, section 11, of the Oregon Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right to * * * be heard by himself and counsel[.]"

[8] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

quality representation, the Office of Public Defense Services shall require
lead counsel at the trial level in each death penalty case to assemble a
defense team including co-counsel, as needed and authorized under
paragraph 2 above, an investigator and a mitigation specialist."

Plan, ¶ 4(a). Finally, the Plan adopts several standards that pertain to counsel in death penalty cases from the American Bar Association *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev ed, Feb 2003), including Guideline 10.4 "The Defense Team," paragraph A, which provides: "When it is responsible for designating counsel to defend a capital case, the Responsible Agency [here, the PDSC] should designate a lead counsel and one or more associate counsel." Plan, ¶ 4(f) (incorporating Guideline 10.4, paragraph A). Those provisions confirm that, in a death penalty case involving an indigent defendant in Oregon, the defense team responsible for furnishing professional assistance to the accused ordinarily includes a lead counsel and a co-counsel. In this case, Smith and McCabe served in those roles until the July 13, 2005, hearing described above. The trial court, in describing its proposed "choice" to defendant, indicated that Smith and Bergland would serve in those roles unless defendant did not accept representation by them, in which case he would represent himself *pro se*.

Although an indigent criminal defendant has a right to the assistance of appointed counsel, that right is not to appointed counsel of the defendant's own choosing. *United States v. Gonzalez-Lopez*, 548 US 140, 151, 126 S Ct 2557, 165 L Ed 2d 409 (2006) ("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."); *see also State v. Davidson*, 252 Or 617, 620, 451 P2d

14

481 (1969) (A criminal defendant has "no right to have another court-appointed lawyer in the absence of a legitimate complaint concerning the one already appointed for him.").

Accordingly, a trial court, in its discretion, may replace a defendant's appointed counsel with substitute counsel. *Langley I*, 314 Or at 258; *see also* Wayne R. LaFave, 3 *Criminal Procedure* § 11.4(b), 703 (3d ed 2007) ("Because the indigent defendant has no right to appointed counsel of choice, he also has no right to replace one appointed counsel with another even if that can be done without causing any delay in the proceedings").[9]

A defendant also may elect to waive his or her right to counsel and proceed *pro se*. However, under Article I, section 11, that waiver must be knowing and intentional. As the court in *State v. Meyrick*, 313 Or 125, 133, 831 P2d 666 (1992), explained,

> "a trial court may accept a defendant's proffered waiver of counsel only if it finds that the defendant knows of his or her right to counsel and, if indigent,

_____

[9]     ORS 135.050(6) provides a statutory limitation on the trial court's discretion to appoint substitute counsel:

> "Unless otherwise ordered by the court, the appointment of counsel under this section shall continue during all criminal proceedings resulting from the defendant's arrest through acquittal or the imposition of punishment. The court having jurisdiction of the case may not substitute one appointed counsel for another except pursuant to the policies, procedures, standards and guidelines of the Public Defense Services Commission under ORS 151.216."

The PDSC guidelines provide that a court may substitute one appointed counsel for another either when, after reviewing appointed counsel's motion to withdraw, the court determines counsel "cannot ethically continue to represent the client," or "in other circumstances, when the interests of justice so require." Public Defense Services Commission, Office of Public Defense Services, *Public Defense Payment Policies and Procedure* § 1.7.1 (8th rev) (effective Oct 22, 2010). In either case, the court must consult with the Office of Public Defense Services. *Id.*

15

of his or her right to court-appointed counsel, and that the defendant intentionally relinquishes or abandons that right."

The requirement that a waiver be "intentional" "refers to a defendant's 'intent' to waive the right." *Id.* at 132 n 8.  Because courts are reluctant to find that a defendant has waived fundamental constitutional rights, we will not presume a waiver of the right to counsel from a silent record.  *Id.* at 131-32.[10]

The touchstone of the inquiry into a motion to withdraw as counsel is: "[W]hether there has been a breakdown in the attorney-client relationship sufficient to establish an abridgement of the constitutional right to counsel." *State v. Davis*, 345 Or 551, 580, 201 P3d 185 (2008).  When faced with a defense counsel's motion to withdraw, the trial court must consider the circumstances involved and determine whether defense counsel is able to provide adequate representation for the defendant.  *Id.* at 581-82. Although a trial court may inquire into a defendant's position on defense counsel's motion, the defendant has no burden to provide information in support of or in opposition to such a motion.  Nor can a motion to withdraw by defense counsel, standing alone, be treated as an implied waiver of a defendant's right to counsel.  *See Meyrick*, 313 Or at

---

[10]    The federal constitution requires a similar standard for a waiver of the right to counsel:

"The Sixth Amendment right to counsel may be waived. *Faretta v. California*, 422 US 806, 95 S Ct 2525, 45 L Ed 2d 562 (1975) * * * . Courts indulge in every reasonable presumption against waiver of the right to counsel. *Johnson v. Zerbst*, 304 US 458, 465, 58 S Ct 1019, 82 L Ed 1461 (1938).  Accordingly, a valid waiver will not be presumed from a silent record. *Burgett v. Texas*, 389 US 109, 114-15, 88 S Ct 258, 19 L Ed 2d 319 (1967)."

*Meyrick*, 313 Or at 136-37.

132-33 (explaining that waiver of counsel must be a voluntary and intentional act undertaken by a defendant). Because the right to counsel is one held personally by the defendant, any waiver of that right must originate with the defendant.

We review a trial court's decision to grant or deny a motion for withdrawal of counsel for an abuse of discretion. *Davis*, 345 Or at 578-79 (denial of motion to withdraw). If a trial court grants a motion to withdraw and does not appoint substitute counsel, thus requiring the criminal defendant to proceed *pro se*, we review for error of law whether the defendant has knowingly and intentionally waived his or her right to counsel. *See Meyrick*, 313 Or at 133 (setting out legal standard for waiver analysis).

With those legal standards in mind, we return to the facts of this case. As noted, the trial court held a hearing on Smith's and McCabe's joint and individual motions to withdraw, which were supported by affidavits from both attorneys. Those were the only motions regarding defendant's representation pending before the court; prior to the hearing, the court declined to allow defendant, acting *pro se*, to file a motion to substitute new counsel for Smith and McCabe. After allowing defendant an opportunity to examine the contents of Smith's and McCabe's affidavits, the court inquired into defendant's position on the motions. Defendant, through his counsel, responded that he supported the motions because he felt that the attorney-client relationship had broken down. Defendant declined to elaborate further in open court. Defendant sought to submit an affidavit under seal to the court explaining his position on the motions to withdraw, but the court declined to consider it. The court then considered Smith's and McCabe's affidavits and noted that both affidavits averred the existence of

17

evidence of "irreconcilable differences * * * not of [defendant's] making." The court further determined that, as to McCabe, the strain on the attorney-client relationship was genuine and that, as a result of that strain, McCabe could not provide adequate assistance of counsel. As to Smith, the court determined that Smith's relationship with defendant could be rehabilitated "if defendant were to cooperate." Stated differently, the court concluded that there was evidence of some degree of breakdown in the attorney-client relationship involving Smith, but that that evidence was insufficient to demonstrate that Smith was not capable of providing adequate representation consistent with defendant's constitutional right to counsel.

Based on those determinations, the trial court granted McCabe's motion to withdraw but denied Smith's motion. Thus, Smith continued to act as defendant's appointed lead counsel, and the court identified Bergland as Smith's co-counsel on the defense team. Those rulings resolved all pending motions pertaining to defendant's prospective legal representation. The court also declined to postpone the trial date of October 17, 2005. At that point, the only remaining matter for the trial court to address was a schedule for pretrial motions.

The trial court, however, raised another issue. Immediately after ruling on the motions before it, the court unilaterally confronted defendant with the choice of either (a) affirmatively accepting Smith and Bergland as his counsel, or (b) proceeding *pro se* either with or without the assistance of advisory counsel. Defendant, as noted, responded through counsel that he did not want to "accept any of those choices" and instead desired to have "the Court go ahead and direct how he is to proceed." Defendant also stated

18

repeatedly that he did not wish to represent himself. Citing defendant's refusal to make a choice from those alternatives as evidence of defendant's misconduct, the trial court treated defendant's response as a request to proceed *pro se*.

The trial court erred in ruling that, by declining to make the described choice, defendant had requested to represent himself *pro se*. Defendant's refusal to make the choice proposed by the court did not constitute an express relinquishment of defendant's right to counsel. None of defendant's statements to the court expressed such a waiver. This court will not infer a waiver of a defendant's constitutional right to counsel from a silent record. *Meyrick*, 313 Or at 132.

The state appears to concede that point, acknowledging that the record does not demonstrate an express waiver of the right to counsel. The state contends, however, that the trial court properly could *infer* a waiver of counsel by defendant from the totality of his conduct, including his refusal to elect from among the choices that the court offered and his refusal to cooperate with multiple court-appointed lawyers in his defense. According to the state, defendant's pattern of misconduct and noncooperation justified the court's determination that a waiver of counsel had occurred and that the court thus was authorized to require defendant to represent himself *pro se*. For the reasons that follow, we disagree.

At the outset, it is important to correctly characterize the nature and extent of a defendant's obligation to cooperate in the attorney-client relationship with appointed counsel. A defendant, as a represented client, may choose whether to cooperate with his or her appointed legal counsel and is under no legal duty to make an abstract promise to

19

cooperate with counsel in the future. It is a truism that, in virtually every conceivable circumstance, cooperation by the defendant with appointed lawyers will lead to more effective legal representation. But if a defendant decides that that is not the case, he or she may choose not to cooperate with counsel, subject to the possibility that that choice is the wrong one and that it carries with it potential consequences, including denial by the court of a request for substitute counsel or for postponement of court proceedings and, ultimately, an adverse judgment.

A defendant's noncooperation with counsel may become relevant if counsel seeks to withdraw, asserting a breakdown in the attorney-client relationship based on the defendant's noncooperation. We recognize that a defendant's refusal to cooperate with legal counsel almost always makes the task of representation more difficult. But a defendant's choice to decline to cooperate with counsel is but one of many circumstances that can magnify the difficulty of representing persons accused of crime. A criminal defendant does not violate a legal duty by declining to cooperate with counsel; a defendant who chooses not to cooperate with appointed counsel simply must live with the consequences of that conduct. Thus, a court considering a motion of counsel to withdraw must distinguish between problems in the attorney-client relationship engendered by the defendant's permissible (but usually foolish) decision to decline to cooperate and other problems, such as a bona fide conflict of interest, that prevent counsel from participating effectively in the attorney-client relationship.

Some state and federal courts have held that a defendant may impliedly waive his or her Sixth Amendment right to counsel by engaging in repeated misconduct

20

in the attorney-client relationship. *See* LaFave, 3 *Criminal Procedure* § 11.4(b) at 705-06 nn 29-31 (collecting cases). This court has never had the occasion to consider whether, or to what extent, that same principle adheres under Article I, section 11, of the Oregon Constitution. We address that question here because it is clear that the trial judge justified requiring defendant to make the choice, described above, and later requiring defendant to proceed *pro se*, by pointing to defendant's past behavior with respect to his lawyers and describing that behavior as misconduct or noncooperation.

A criminal defendant, as noted, may waive the right to counsel protected by Article I, section 11, of the Oregon Constitution, if the defendant waives that right knowingly and intentionally. It is not essential that such a waiver be expressed in words. A defendant's conduct may serve as a valid waiver so long as the conduct adequately conveys the defendant's knowing and intentional choice to proceed in court without counsel. However, to establish a waiver of counsel by conduct, something different is required than a mere showing that the defendant has engaged in past or present misconduct.

By way of example, Professor LaFave indicates that a defendant must receive an advance warning that a repetition of behavior that amounts to misconduct will result in the defendant having to proceed *pro se*. LaFave observes that "a true 'waiver by conduct' * * * would require that [the] defendant have received advance warning that continuation of his [or her] abusive behavior would result in * * * being forced to proceed pro se." *Id.* at n 30. We agree with that observation. An advance warning of that kind is necessary to alert the defendant to the fact that a repetition of demonstrated

21

misconduct may result in a waiver of the right to counsel, rather than some other consequence.

In deciding whether a defendant's misconduct constitutes a waiver of counsel by conduct, a court must bear in mind the distinction between a defendant's noncooperation with appointed counsel and the kind of misconduct that may establish a waiver of counsel by conduct. As noted, the trial court in this case repeatedly inquired whether defendant would agree to cooperate with his appointed counsel and, when defendant declined to make that agreement on the advice of counsel, the court concluded that defendant was engaging in misconduct and manipulation. It is perhaps conceivable that a defendant's recalcitrant behavior toward counsel can move beyond noncooperation and become misconduct that defeats the ability of counsel to carry out the representation function. As we discuss below, however, the record here does not support the conclusion that defendant waived his right to counsel by engaging in some form of misconduct.

The trial court noted that, in the past, it had replaced defendant's appointed trial counsel on some occasions for valid reasons. The court also observed that, on other occasions, defendant had raised objections about his appointed counsel without good cause to inflate interpersonal problems, fabricate conflicts with counsel, and otherwise manipulate the court into postponing legal proceedings simply to create needless delays. The trial court stated that it had scolded defendant for that conduct or had indicated that the court may be compelled at some point to require defendant to proceed with his appointed counsel notwithstanding his objections about their representation. The court, however, did not refer to or otherwise base its decision on any prior warning to defendant

22

that repetition of defendant's manipulative behavior to unreasonably delay court proceedings would (or even could) result in the court requiring him to proceed *pro se*. Neither party refers to such a warning in the record. Our review of the record indicates that the required prior warning that we have described is lacking in this case.

The record also falls short of demonstrating that, during the hearing, defendant engaged in misconduct by complaining about his lawyers' representation and declining to make the choice that the trial court identified. The trial court, as noted, had resolved the pending motions of Smith and McCabe for withdrawal of counsel when it granted McCabe's motion and denied Smith's motion. The court indicated that Smith and Bergland would serve prospectively as defendant's appointed counsel.[11] The court was well aware that defendant had asserted earlier that his relationship with Smith had broken down and that defendant supported Smith's motion to withdraw as counsel.[12] The court, as noted, declined to consider defendant's evidence regarding those assertions.

The trial court's subsequent presentation of the choice regarding representation, described above, to defendant implicitly required defendant to waive or abandon his objections to Smith's representation as the price of avoiding having to represent himself *pro se*. In contrast with the court's earlier decision on the attorneys' motions to withdraw, in which the court focused on the lawyers' factual claims about

---

[11] The task of naming the appointed counsel for the defense team was the court's responsibility, not defendant's.

[12] As noted, defendant prior to the July 13, 2005, hearing had attempted *pro se* to file a motion for substitute counsel, but the court had declined to accept that *pro se* motion for filing. Consequently, there was no motion by defendant for substitute counsel pending before the court at the time of that hearing.

23

their ability to adequately represent defendant, the court's submission of the choice regarding prospective representation to defendant was based on the court's mere assumption that defendant's potential complaints about his lawyers were frivolous and amounted to further misconduct and manipulation of the court.

There are several problems with the court's approach. To begin, defendant has no legal obligation to waive or abandon his objections regarding his appointed counsel or, as already noted, to affirmatively cooperate with their legal representation. The court erred in pressuring defendant to disregard his concerns about his legal representation and to cooperate with appointed counsel. [13]

Moreover, even if a client's objections to counsel could constitute misconduct in other circumstances, the court in this case based its assumption that defendant's complaints about his lawyers were frivolous only on the evidence proffered by Smith and McCabe in their sealed affidavits. The court inquired about defendant's complaints, but made it clear that the court would require defendant to disclose all that information in open court. That approach necessarily would require defendant to publicly discuss his private communication with his lawyers and, in all likelihood, sensitive information about trial strategy. Even after the state sought to eliminate that

---

[13]    This case does not require us to decide whether a client's objections about appointed counsel can constitute misconduct. In most conceivable circumstances, a criminal defendant's expression of objections about appointed counsel or submission of one or more motions to obtain substitute counsel will not constitute misconduct because criminal defendants commonly submit them to the court without the benefit of legal training and without the assistance of a lawyer and the fact that such submissions lack merit will not evidence a knowing and intentional waiver of counsel. Whether circumstances might exist in which a court could infer such a waiver is a question for another day.

24

problem by agreeing to a nonpublic disclosure of defendant's objections out of the state's presence, the court continued to request that defendant publicly disclose his problems with his appointed legal counsel. Defendant declined to do so on the advice of counsel.[14] As a result, the court assumed that defendant was engaging in misconduct and manipulation without considering defendant's side of his dispute regarding his legal representation. That was a legal error. In our view, before a court properly can reach that conclusion, the court must allow the defendant a reasonable opportunity to present his or her position on the facts in a manner that permits, if appropriate, the safeguarding of confidential communications and trial strategy from public disclosure.

The fact that defendant had not moved to obtain substitute counsel at the hearing does not alter our conclusion. Such a motion would have required the court to consider any evidence offered by defendant in support of the motion. A claim of legal error regarding a court's refusal to consider defendant's evidence in that procedural context at a minimum would present the legal issue in the starkest terms. But the choice regarding representation proposed by the court here made it clear to defendant that the court would consider defendant's complaints about his legal representation only if

---

[14] A criminal defendant is entitled to the right to remain silent and to the confidentiality of privileged communications with counsel. But when a defendant seeks to demonstrate to the court that counsel is not providing adequate representation, the court must consider, not reject, the facts proffered by the defendant, as well as other relevant evidence in the entire record, before deciding whether the defendant's complaints have any merit and, even if they do not, whether the defendant's behavior as a separate matter constitutes misconduct. In that connection, the court should take reasonable precautions to permit a defendant to communicate any concerns about counsel's representation without disclosing matters of trial strategy, evidence, or attorney-client confidences to other parties or the public.

25

defendant disclosed them in open court against the advice of counsel. As noted, that was no choice at all. Further, the proposed choice indicated that defendant's only option to avoid self-representation was to accept representation by Smith and thus acquiesce in the court's assumption that defendant's unexamined complaints against Smith were frivolous. That, too, was not a permissible choice.

The foregoing discussion demonstrates that the court erred in requiring defendant to make the choice that the court described. Defendant's decision, on the advice of counsel, to decline to make the proposed choice did not amount to misconduct or manipulation of the court by defendant. By declining to make the choice, defendant did not engage in a knowing and intentional waiver by conduct of his right to counsel in the proceeding that we review here.

The record indicates that the court decided that defendant's refusal to make the offered choice entitled the court to make the choice itself in favor of compelled self-representation, rather than representation by counsel. That was error. In our view, because submission of the choice to defendant was itself impermissible, defendant's refusal to make the proposed choice was entirely proper.[15]

It follows that the trial court erred in requiring defendant to proceed to trial on the sentencing phase of a capital murder case without the assistance of legal counsel.

---

[15] We sympathize entirely with the trial court's expressions of frustration at the extent of the delay that had occurred in the administration of this case due in large part to problems in securing and retaining counsel for defendant. The state points out, and we agree, that if defendant had requested replacement counsel without an adequate justification, or without adequate advance notice to avoid disruption or postponement of trial court proceedings, the court had authority to exercise its discretion reasonably to deny such a request.

26

That was error was not harmless. Consequently, we vacate defendant's death sentence based upon his second assignment of error. The basis of our disposition obviates any need to reach defendant's other assignments of error.

The judgment of the circuit court is reversed and the case is remanded to the circuit court for further proceedings.